Filed 4/13/15  P. v. Napoles CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DAVID NAPOLES et al.,<br><br>    Defendants and Appellants. | B245802<br><br>(Los Angeles County<br>Super. Ct. No. SA069336) |

APPEAL from judgments of the Superior Court of Los Angeles County.  Antonio Barreto, Judge.  Reversed and remanded as to Appellant Miguel Flores; affirmed as modified as to Appellant David Napoles.

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant David Napoles.

Janyce Keiko Imata Blair, under appointment by the Court of Appeal, for Defendant and Appellant Miguel Flores.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Thomas Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

_____

David Napoles and Miguel Flores (collectively defendants) appeal from judgments entered after a jury found each of them guilty of first degree murder and willful, deliberate and premeditated attempted murder. The jury also found Napoles guilty of carrying a loaded and unregistered firearm and having a concealed firearm on his person. The jury further found gang and personal discharge of a firearm enhancement allegations against each defendant to be true. The trial court sentenced Napoles to life plus 75 years to life, and sentenced Flores to 50 years to life.

Flores contends the trial court erred in denying his request for a separate trial from Napoles given the court's admission of the content of a letter against Napoles for the truth of the matter asserted. The prosecution's interpretation of the content of the letter, based on the testimony of its witnesses, implicated Napoles and Flores in the shooting. We conclude the court's limiting instruction did not alleviate the undue prejudice to Flores from admission of the content of this letter, and the court abused its discretion in denying Flores's request for a separate trial. We reverse the judgment against Flores and remand the matter for further proceedings.

Napoles does not challenge the trial court's admission of the letter but he contends the court committed reversible error in admitting certain testimony from police officers regarding their interpretations of the letter. For reasons explained below we reject this contention. We also reject Napoles's contentions the court erred in declining to question jurors regarding their fears about retaliation from persons interested in the case after an alternate juror reported such fears to the court, and in declining to disclose juror identifying information. We affirm the judgment against Napoles as modified to reflect additional mandatory assessments not included in the judgment.

## BACKGROUND

On October 25, 2008, the date of the charged crimes, Napoles was 19 years old and Flores was 15. Evidence presented at trial demonstrates defendants were members of the Culver City Boys criminal street gang. On appeal, neither defendant challenges the jury's true findings on the gang enhancement allegations.

**The Shooting**

In the late afternoon on October 25, 2008, Christina Manon[1] drove her Honda Civic to the Mar Vista Gardens housing project where she picked up her boyfriend, Mauricio Contreras. After driving around for a while, she picked up two other males near Mar Vista Gardens, one whom she described as skinny and one chubby. Manon later identified Napoles as the skinnier male who sat behind her in the backseat of her car. She did not identify anyone as the chubbier male who sat behind Contreras in the backseat. At trial Manon stated she did not believe Flores was the chubbier male who rode in her car to and away from the scene of the crimes. The prosecution's theory, however, is that Flores was the other male in Manon's car.

Manon drove her car, following directions from one of the passengers in the backseat. She stopped the car in an alley adjacent to a laundromat and liquor store in the Mar Vista area of Los Angeles. The two rear passengers exited her car and walked toward the store. It was around 8:00 p.m.

Brothers Edgar and Guillermo Lopez (the victims)[2] exited the liquor store and were approached by two "Hispanic" males, one whom Edgar described as slim and one chubby, each carrying a gun. The slim male—who Edgar later identified as Napoles— was holding a black semi-automatic handgun and asked the brothers about their gang affiliation. The brothers stated they did not belong to a gang. Naploes smirked and

---

[1] When this case was filed, Manon was a codefendant. About one year before the trial at issue, Manon pleaded guilty to voluntary manslaughter and admitted a gang enhancement allegation. Under the terms of her plea deal, Manon testified at trial for the prosecution.

[2] Edgar Lopez testified at trial. He claimed not to remember significant facts about the shooting. Therefore, the prosecutor read his preliminary hearing testimony to the jury and played an audio recording of his October 27, 2008 interview with an investigating detective.

indicated he believed the brothers were "'from Venice.'"[3] Napoles and the chubby male—who Edgar later identified as Flores—began firing their guns at the brothers. The chubby male was holding a chrome revolver.

Both brothers were struck by gunfire. Guillermo died from gunshot wounds to his chest and back. Edgar suffered gunshot wounds to his right leg as he tried to run away.

Manon did not observe the shooting but she heard six or seven gunshots. Napoles and the chubby male ran back to her car and climbed inside. Manon drove toward Mar Vista Gardens. She dropped off the two men in different locations, and then returned with Contreras to his residence.

The first 911 call concerning the shooting came in at around 8:13 p.m. At around 8:23 p.m., a woman named Carmen Diaz who lived about 1.3 miles from the crime scene dialed 911 and reported she observed a Hispanic male, around 19 years old (whom she later identified as Naploes), outside her home carrying a long gun shorter than a rifle.[4]

**Napoles's Arrest and Identification as a Gunman**

Diaz had arrived home shortly after 8:00 p.m. and found a pickup truck parked in her driveway with a few men standing around it. Diaz asked the men to move the truck and one of them did. Diaz parked her car and went inside her house. Diaz got ready for a party and returned outside to leave. The same truck was blocking her driveway again. For the second time, Diaz asked the men to move the truck. One of the men said, "'He's running.'" Diaz looked and saw a man she later identified as Napoles running toward her house with a long silver gun in his hand. The men entered the truck and drove away. Napoles said, "'Fuck, I missed them." Diaz ran inside her house, dialed 911, and reported the man with the gun. She told the operator it sounded like someone was trying to enter a door to her house. She believed the man with the gun was in her backyard.

---

[3] Evidence presented at trial indicated the Culver City Boys and Venice 13 gangs were rivals.

[4] Diaz testified at trial and a recording of her 911 call was played for the jury.

4

Several officers arrived outside Diaz's house and searched for the man she had described (a male around 19 years old with a "faded" hairstyle, wearing a gray shirt and dark jeans). Officers detained two men, but Diaz stated neither was the man she had seen with the gun.

An officer in a helicopter observed a male in a light-colored shirt and dark pants running from behind Diaz's house toward another residence. The officer shined a spotlight from the helicopter to illuminate the area. The officer saw the man either knocking on or trying to enter a window at the house next door to Diaz's house. Eventually the man sat down in a lawn chair.

Officers on the ground took the man (Napoles) into custody. He was wearing a gray T-shirt and blue jeans. As officers walked Napoles past Diaz, she confirmed Napoles was the man she had seen running toward her house with a gun.[5] Officers placed Napoles in a patrol car. He told an officer he was a Culver City gang member and his moniker was "Noodles."

Officers searched for a gun without success. Then Diaz told officers she remembered seeing Napoles run toward a truck parked east of her house before he ran into her backyard. An officer searched that area and found two guns at the curb a couple of houses away from Diaz's house. One was a nine-millimeter semi-automatic blue steel handgun with 11 live rounds in the magazine. The other was a .357-caliber Magnum revolver with one live round and five expended casings inside. Diaz told an officer the stainless steel revolver was the gun she saw Napoles holding.

A firearms examiner later conducted testing and concluded four nine-millimeter shell casings and an expended bullet recovered from the crime scene were fired from the nine-millimeter handgun found at the curb near Diaz's house. He further concluded a bullet recovered from Guillermo Lopez's body and an expended bullet recovered from the crime scene were fired from the revolver found at the curb near Diaz's house. A criminalist determined Napoles could not be excluded as a contributor to a DNA swab

---

[5] At trial, Diaz denied she had made such an identification.

5

sample taken from the nine-millimeter handgun. Napoles was excluded, however, as a contributor to a DNA swab sample taken from the revolver.[6]

Two days after the shooting, on October 27, 2008, a detective interviewed shooting victim Edgar Lopez. Edgar described one of the perpetrators as a Hispanic male with dark skin, between 18 and 20 years old, weighing about 140 pounds and standing about 5 feet 7 inches tall. This "slim" man, who had short hair and no facial hair, was wearing black and white batting gloves, black jeans and a gray sweatshirt with the hood down. The slim man was the person who "did all the talking," asking the victims where they were from and commenting on their response.

Edgar described the second perpetrator as a "light skinned" Hispanic male, between 18 and 21 years old, who was "really short," standing about 5 feet 5 or 5 feet 6 inches tall. This suspect was wearing blue jeans and a gray sweatshirt with the hood up.

On October 31, 2008, Edgar selected a photograph of Napoles from a photographic lineup and identified Napoles as the man armed with a handgun, who did all the talking and fired upon Edgar and his brother. The investigating detectives acknowledged at trial that Napoles's photograph was the only one in the lineup in which the person was sneering or smirking. Also on October 31, 2008, a detective showed Edgar a photograph of the guns recovered near Diaz's house. Edgar stated the guns in the photograph looked similar to the guns he observed on the night of the shooting. He also noticed the handgun in the photograph had the same wooden grip as the gun Napoles used during the shooting.

On November 3, 2008, eyewitness Aksana Guzman viewed the same photographic lineup Edgar had viewed days earlier, and she also selected a photograph of Napoles. She told the detective who administered the lineup: "'Photo number 5 is possibly the person I saw do the shooting. He was dark-complected and had a thin moustache.'"

---

[6] According to the criminalist, the DNA taken from the revolver indicated a "major female profile." Christina Manon was later excluded as a contributor to the DNA swab sample taken from the revolver. Defendant Flores was later excluded as a contributor to the DNA swab sample taken from the nine-millimeter handgun.

At the time of the shooting, Guzman was sitting in her car which was parked just north of the liquor store, on the same side of the street, facing toward the liquor store. Guzman saw two men exit a Honda Civic which had stopped in the alley. The man who exited from the rear driver side seat was tall, slim and dark-complected compared to the man who exited from the rear passenger side seat who was shorter, heavier and had a lighter complexion. The heavier man stopped by a wall and the thinner man walked toward the liquor store. Guzman stopped paying attention to the two men until she heard gunshots. Then she saw the men run back to the Honda Civic and the car drove away. The thinner man had something shiny in his hand which appeared to be a gun. The heavier man was empty-handed. On the night of the shooting, Guzman told a detective the thinner man appeared to be in his early 20's, was about 5 feet 11 inches tall, had a shaved head, and was wearing dark jeans and a gray shirt with a white shirt underneath. She told the detective the heavier man also appeared to be in his early 20's, was about 5 feet 7 or 5 feet 8 inches tall, was slightly heavier than the other man, wore his hair in a short curly ponytail, and was wearing a black sweatshirt with the hood down.[7]

On November 4, 2008, detectives interviewed Manon after officers observed her mother's car in a store surveillance video near the crime scene around the time of the shooting. An officer recognized the car because he had stopped it 10 days before the shooting and found Manon driving with four members of the Culver City Boys. During the interview, Manon selected a photograph of Napoles from a photographic lineup and identified him as one of the two male passengers who exited her car at the crime scene and returned to her car after she heard gunfire. Manon told detectives Napoles was the skinnier of her two backseat passengers. She also stated, at the time of the shooting, Napoles had no facial hair, and he wore his hair short in a "fade." The photograph

_____

[7] At trial, Guzman stated the heavier man weighed about 150 pounds. One of the investigating detectives testified Flores—whom prosecutors argued was the heavier male—weighed 240 pounds when he was arrested in January 2009. There is no evidence Flores ever wore his hair in a ponytail.

7

Manon selected, taken on the night of the shooting, however, shows Napoles with a moustache and beard.

Manon told detectives the other backseat passenger was chubbier, younger and had a lighter complexion than the other perpetrator (Napoles). She also stated the chubbier male had high cheekbones and rosy cheeks and was wearing a gray hooded sweatshirt with a zipper in the front.

**Identification of Flores as a Suspect**

Flores was not identified as a suspect until more than two and one-half months after the shooting. On January 8, 2009, the investigating detectives on this case observed Flores being led through the police station in handcuffs by gang officers after an arrest on an unrelated robbery. They took notice of Flores, believing he fit the general description of the second shooter: a young, overweight Hispanic male with a light complexion. One of the detectives asked a gang officer about Flores and learned he was a documented member of the Culver City Boys gang who lived in Mar Vista Gardens housing project.[8] The officer informed the detective a search of Flores's residence was underway in connection with the robbery arrest.

During the January 8, 2009 search of a bedroom identified as Flores's, gang officers found red clothing they associated with the Culver City Boys criminal street gang. They also discovered a birthday card and three letters in a dresser drawer. The birthday card was made out to "Miguel Flores." A letter "'To Mickey,'" dated August 1, 2008, was with an envelope addressed to "Miguel F." from a person named "'Greg.'" The letter indicated the author was in custody and expected to be released in four weeks. A letter "'To Mixter,'" dated May 19, 2008, was with an envelope bearing Flores's address and a return address from Greg. This letter also indicated the author was in custody and missed "'the homies'" and the "'projects.'" Gang officers knew Flores used the gang monikers Mickie and Mixter.

---

[8] Napoles also lived in Mar Vista Gardens.

The other letter gang officers found in a dresser drawer in Flores's bedroom is central to issues raised on appeal. There was no envelope found with this January 1, 2009 letter. The letter was directed to someone called "Juicee-Jay." There was no evidence Flores ever used such a moniker or nickname. The letter was signed by "David N." Gang officers who found the letter believed it was written by defendant David Napoles because he was the only David N. they knew. The letter states:

"West up ma boy? How's everything out there? You doing good? Staying out of trouble? You better nigga. Be low-key foo, is the only way. I ran into Big Post-Rocc. Kicked it with Grande and Jojo. Grande left to the pen already. He'll be out in less than 4 years. Big Poste went back to the pen too. That foo looks just like Lil Poste foo, and acts like him too. Hey foo, you know you a Projecc-Boy right. I already told Blacc-Stone. Now is you and Lil Post Rocc. So be cool out there foo. We need you niggas to be out there. But most important, safe and healthy nigga. Try to barebacc all the itty-bitties foo, LOL. Is your time to shine. 'Cus I already seen your 'spark,' you feel me. Hahaha!!! I got a cunis already foo, but he's gonna do what he's gonna do, you know. Some niggas learn the hard way. Tell all my boys I said – West up! Keep they head up including you. This is it for now, gotta get some sleep for yard tomorrow. With much . . . . . . . [¶] Love & Respect [¶] From [¶] Your boy David N. [¶] P.S. Send some pix. . . ."

As explained in more detail below, the prosecutor argued at trial that this letter, which came to be known as the "David N. letter," was directed to Flores from Napoles and references the October 25, 2008 murder/attempted murder where it states, "Is your time to shine. 'Cus I already seen your 'spark,' you feel me. Hahaha!!!." The prosecutor asserted "'spark,'" as used in the David N. letter, means the muzzle flash from gunfire.

On January 16, 2009, Edgar Lopez selected Flores's photograph from a photographic lineup and identified him as the second shooter. Flores was the only person in the six-pack lineup who was wearing a gray hooded sweatshirt (or a hooded sweatshirt of any color), which is how Edgar described the second shooter's clothing in his October

9

27, 2008 interview with a detective. When he selected Flores's photograph, Edgar told the detective, "'He has the same round face and slanted, droopy eyes. He was chubby and he was holding the chrome gun.'"

On January 22, 2009, eyewitness Aksana Guzman selected Flores's photograph from the same photographic lineup Edgar had viewed. She told the detective Flores "'looks similar to the second suspect I saw exit the car in the alley . . . .'" She also stated, "'I remember the suspect . . . was heavy and wide looking, and had a light complexion compared to the second suspect. He looked young in age.'"

**Trial, Verdicts and Sentencing**

During his preliminary hearing testimony, which was read at trial, Edgar Lopez identified Napoles and Flores as the males who shot at him and his brother on October 25, 2008.

On direct examination at trial, Guzman identified Napoles and Flores as the men she saw exit the Honda Civic before she heard gunfire. On cross-examination, however, Guzman explained she had not meant to make a positive identification of Napoles during direct examination. She meant to indicate Napoles "possibly could be" the thinner man she saw at the scene of the shooting.

Also on cross-examination, Guzman testified the heavier man she saw did not weigh 250 pounds or even close to that weight. At the time of his arrest, Flores was 15 years old, stood 5 feet 8 inches tall, and weighed 240 pounds. When Guzman viewed the six-pack containing Flores's photograph, she was surprised to see that all the males looked young, around 16 or 17 years old. Her recollection was that the heavier male appeared to be in his early 20's. Nonetheless, she chose the photograph of the male whose face looked most similar to the heavier, lighter-skinned male's face.

Christina Manon identified Napoles at trial as the thinner man who drove to and away from the crime scene in her car, consistent with her November 4, 2008 interview and her proffer statement made in connection with her plea deal.

Manon never identified Flores as the chubbier male who rode in her car. After her arrest in this case in July 2009, she saw Flores in the courtroom and did not recognize

10

him. At her arraignment, she asked the bailiff who Flores was, and the bailiff stated Flores was her codefendant. Manon did not know Flores. She told the bailiff he did not look like the person she saw on the night of the shooting. At trial, Manon testified she did not believe Flores was in her car that night. Flores appeared taller than her chubby backseat passenger.[9]

In his defense, Flores called a psychologist/memory expert who testified about the unreliability of eyewitness identification. Neither Napoles nor Flores testified at trial.

The jury found Napoles and Flores guilty of the first degree murder of Guillermo Lopez (Pen. Code, § 187, subd. (a);[10] count 3), and the willful, deliberate and premeditated attempted murder of Edgar Lopez (§§ 187, subd. (a) & 664; count 4). The jury also found Napoles guilty of carrying a loaded and unregistered firearm (§ 12031, subd. (a)(1); count 1), and having a concealed firearm on his person (§ 12025, subd. (a)(2); count 2). The jury further found the crimes were committed for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)), and, in the commission of the murder and attempted murder, defendants personally used and discharged a firearm causing death or great bodily injury (§ 12022.53, subds. (b)-(e)).

The trial court sentenced Napoles to life plus 75 years to life in prison: 25 years to life for the murder, plus a consecutive term of 25 years to life for the firearm enhancement; a term of life for the attempted murder plus a consecutive term of 25 years to life for the firearm enhancement. The court imposed a concurrent term of three years for carrying a loaded and unregistered firearm plus four years for the gang enhancement. The court stayed the sentence for having a concealed firearm.

The trial court sentenced Flores to 50 years to life in prison: 25 years to life for the murder, plus a consecutive term of 25 years to life for the firearm enhancement. The

_____

[9] In his October 27, 2008 interview with a detective, Edgar described the second, heavier shooter as being "really short."

[10] Statutory references are to the Penal Code unless otherwise indicated.

11

court imposed a concurrent term of life for the attempted murder plus 25 years to life for the firearm enhancement.

## DISCUSSION

### I.    The David N. Letter

Flores contends the trial court committed reversible error in admitting the David N. letter as evidence against him.  Napoles contends the trial court committed reversible error when it admitted opinion testimony from certain officers that Napoles authored the David N. letter and made a reference to the murder and attempted murder in that letter. We set forth defendants' contentions in more detail below.

#### A.  Pretrial proceedings

On September 23, 2010, Flores filed a motion requesting the court order separate trials for Flores and Napoles based on Flores's assumption the prosecution intended to introduce the David N. letter at trial and argue it was a communication from Napoles to Flores referencing the murder/attempted murder at issue in this case.[11]  Citing the *Aranda-Bruton*[12] line of cases, Flores argued in the motion that "[i]ntroduction of this letter against codefendant Napoles in a joint trial with Mr. Flores will impermissibly deprive Mr. Flores of his constitutionally guaranteed right to confront all witnesses against him.  In order to prevent such reversible error, Mr. Flores must be granted a separate trial."

In its November 4, 2010 opposition to Flores's motion for a separate trial, the prosecution proposed to redact the letter before introduction at trial to remove the following purported reference to the murder/attempted murder:  "Is your time to shine. 'Cus I already seen your 'spark,' you feel me.  Hahaha!!!"  The prosecution argued in its

---

[11] Flores also filed a separate motion requesting the trial court exercise its discretion to sever his trial from that of his codefendants due to "the significant disparity in the evidence against Manon and Napoles and the evidence against Flores."

[12] *People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. United States* (1968) 391 U.S. 123.

12

opposition that the proposed redaction "cures any potential Aranda-Bruton error," and the prosecution should be permitted "to introduce the remainder of the letter for the purpose of establishing that defendants Flores and Napoles are acquainted with each other, and for the purpose of establishing that defendants Flores and Napoles are members of the Culver City Boys criminal street gang."

In his reply brief, Flores disputed the proposed redaction would cure the confrontation clause issues because there are other incriminating statements in the letter regarding Flores's gang membership. Flores also argued the letter is inadmissible hearsay.

On February 4, 2011, the court ordered the trial of Flores and Napoles severed from that of Manon. On March 28, 2011, the court denied Flores's motion to sever his trial from that of Naploes and ruled the David N. letter was admissible against Flores to show his relationship with Napoles and as a basis for the gang expert's opinion.

On May 31, 2011, Flores filed a motion to enter an admission of the gang enhancement allegation and to exclude gang evidence. He argued, if the court were to accept his admission, the David N. letter would have no probative value and the court should exclude it. The court had not yet ruled on this motion when it granted a mistrial during jury selection on June 6, 2011, after learning Flores's lead counsel had been hospitalized and cocounsel was scheduled to deliver her baby the same week.

Nearly a year later, during pretrial proceedings on May 4, 2012, the trial court and counsel revisited the issues surrounding admission of the David N. letter. The court (the same judge who had heard the motions described above) decided "to start over from scratch" because there was a new prosecutor, new counsel for Flores, and two defendants (Napoles and Flores) before the court instead of three (Manon had entered into a plea agreement in June 2011). Flores and Napoles objected to admission of any portion of the letter on grounds there was insufficient foundation to show Napoles authored the letter or Flores was the intended recipient. In the alternative, Flores and Napoles asked the court to excise the portion of the letter concerning the "'spark'" comment under Evidence Code section 352. Unlike the former prosecutor, the new prosecutor did not offer to redact the

13

letter to remove the comment about seeing the "'spark.'" Flores again offered to stipulate to his gang membership and admit the gang enhancement allegation so the prosecutor could not say the purpose of introducing the letter was to prove Flores's gang ties.

The trial court ruled there was sufficient foundation to establish Napoles authored the David N. letter. The court declined to redact the letter, and stated the prosecutor could argue the "'spark'" comment meant Napoles had seen Flores fire a gun. The court reserved its ruling regarding the admissibility of the letter against Flores, stating it wanted to know more about "the circumstances under which the letter was found." Flores renewed his request for a separate jury, arguing the "'spark'" comment would be overly prejudicial to him even if the court were to give a limiting instruction regarding its admissibility.

On May 7, 2012, the trial court held an Evidence Code section 402 hearing and questioned Los Angeles Police Department (LAPD) Officer Heather Erhardt regarding the circumstances under which the David N. letter was found in Flores's residence.[13]

The following day the trial court issued its final ruling regarding admissibility of the David N. letter, stating: "The truth of the letter would be hearsay against Mr. Flores, and so it's not coming in for the truth. It can come in for the truth against Mr. Napoles if the jury believes he authored the letter, but only if they believe he authored the letter. And the existence of the letter comes in against both defendants for the purpose of the gang expert's opinion." Defendants reiterated their foundational objections. Flores again asked the court to exclude the letter under Evidence Code section 352. The court declined to reconsider its ruling.

**B. Evidence and limiting instructions at trial regarding the letter**

LAPD gang Officers Heather Erhardt and Michael Switzer participated in the January 8, 2009 search of Flores's residence during which the David N. letter was found.

---

[13] Those circumstances—including the location where the letter was found and the other letters and birthday card found with it—are set forth above in the background section of this opinion.

14

After Officer Erhardt read the letter to the jury, the trial court informed the jury: "As to this letter, members of the jury, the jury is to determine ultimately after you've heard all the evidence, whether you believe that this letter was authored by Mr. Napoles or not. That's your decision to make. [¶] If you find that it was authored by Mr. Napoles, then the contents of the letter may be considered as evidence against him. The letter, however, was not authored, apparently, and I don't think it's the People's theory, that it was authored by Mr. Flores. Therefore, as to Mr. Flores, the contents of the letter are not received for the truth of the matter asserted therein, only to show that the letter, in the fashion that it's written, was found in the dresser as described. It appears to be his room. So you may consider that not for the truth of the matter asserted. You can consider it for the truth of the matter asserted therein if you think it was authored by David Napoles."

Officer Erhardt testified she believed Napoles authored the letter because he was the only David N. she knew. The letter also made her think of Napoles because there was a "little cartoonish figure" next to the name David N. and she recalled Napoles being charismatic when she interviewed him. Upon first reading the letter, Erhardt did not interpret the phrase "I already seen your 'spark'" to be a reference to a muzzle flash from a gun. Erhardt passed the letter on to Detective Luis Carranza, one of the investigating detectives on this case.

Officer Switzer testified he believed a member of the Culver City Boys authored the letter based on its language. He immediately thought of Napoles because he is the only David N. Switzer knew. Upon first reading the letter, Switzer believed it "was essentially a thinly-veiled inside joke between two people that . . . committed a homicide." In his "three years of dealing primarily with this [the Culver City Boys] gang," however, he had never heard a gang member use the term "'spark'" to refer to a shooting or to anything else. The use of the word "'spark'" in the David N. letter therefore "jumped out to [him] as being really corny, like it absolutely had an ulterior meaning."

LAPD Detective Joe Lumbreras, one of the investigating detectives on this case, testified that when he read the David N. letter he interpreted the word "'spark'" to mean

15

"the flash of gunfire." He also believed, in a gang context, the word could mean "enthusiasm," or someone who is "down for the gang," committing crimes for the gang.

Officer Angel Gomez, the prosecution's gang expert, testified he believed Napoles authored the David N. letter based on the letter's language, context, and timeframe. Moreover, he did not know any other Culver City Boys gang member with the name David N. or the last initial N, let alone one who was in custody at the time the letter indicated. Gomez was familiar with the Culver City Boys gang members whose monikers were referenced in the letter. He did not know any Culver City Boys gang member with the moniker Juicee-Jay, the name listed as the letter's intended recipient. He had heard of a rap artist with the name Juicee-Jay. Gomez knew Flores used the monikers Mickie and Mixter.

Officer Gomez testified as follows about his interpretation of the statements in the David N. letter, "Is your time to shine. 'Cus I already seen your 'spark,' you feel me. Hahaha!!!": "I believe at that point he's telling them that he's seen some type of potential in him, or he's seen him do something. He's now -- it's now his turn because he's out there. So it's his time to shine, to spark." Based on his knowledge of gang parlance, Gomez could not say the word "'spark'" was a reference to a muzzle flash. Later in Gomez's testimony, however, when the prosecutor asked him to relate the word "'spark,'" as used in the letter, to a hypothetical assuming the facts of the case from the prosecutor's perspective, Gomez testified: "I think taking all those different things that you said into light, the word, "'spark,'" would be a reference to some kind of muzzle flash from a gun."

Officer Gomez opined Flores had the letter "C" for Culver City Boys tattooed on each shin after he was taken into custody in this case because he had "done something to earn the right to be able to put that on his body." None of the field identification cards documenting contacts between Flores and gang officers indicated he had tattoos on his shins prior to his arrest in this case.

During the prosecutor's closing argument, the trial court informed the jury: "The letter, first of all, as I've said many times -- I'll say it again -- first the jury has to decide

16

who the author of the letter is, and whether it's Mr. Napoles or not. If the jury decides that the letter was authored by Mr. Napoles, the content of the letter is admissible against Mr. Napoles. [¶] The content of the letter is not admissible against Mr. Flores. What is admissible is the fact that the letter was found in an area, apparently, accessible to Mr. Flores, and what appears to be a room where his -- he keeps in the residence. So it is the presence of the document that becomes relevant, not only to show as -- if the jury so finds -- some connection between Mr. Flores and Mr. Napoles, but also as it relates to the opinion of the gang expert on the very subject that we're talking about."

The prosecutor argued during closing argument that Napoles was telling Flores the following in the David N. letter: "You've made it. You've made the cut. You've passed the initiation. You've done good, my boy. Stay out there with these other gang members. You're doing good. Hey keep fooling around with the young girls. Keep that up. You're doing good. It's good that you killed somebody. It's good that you shot somebody because you know what? I see your spark."

The prosecutor further argued: "Now, you've heard a lot of testimony, what does, "'spark,'" mean? Angel Gomez says in this context in his initiation letter it is saying that David Napoles saw a spark from a muzzle flash come from Miguel Flores. That's what that means. There's no other reasonable interpretation of the letter. This letter is an admission. It is a confession by David Napoles that he was there at that crime; that he saw the spark."

### C. Flores's contentions on appeal regarding David N. letter

Flores contends the trial court abused its discretion in denying his request for a separate trial from Napoles given the court's admission of the David N. letter for the truth of the matter asserted against Napoles.

In his opening appellate brief, Flores asserted the trial court's admission of Napoles's extrajudicial statement—the David N. letter—violated his Sixth Amendment right of confrontation. Citing the *Aranda-Bruton* line of cases, Flores argued the court abused its discretion in denying his request for a separate trial from Napoles because the unredacted David N. letter implicated him in the crimes, he did not have an opportunity

to cross-examine Napoles, and the court's limiting instruction did not cure the confrontation clause violation. (*Bruton v. United States*, *supra*, 391 U.S. at p. 137 ["the introduction of Evans' confession posed a substantial threat to petitioner's right to confront the witnesses against him, and this is a hazard we cannot ignore. Despite the concededly clear instructions to the jury to disregard Evans' inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination. The effect is the same as if there had been no instruction at all"]; *People v. Aranda*, *supra*, 63 Cal.2d 518.)

We must reject this argument because the David N. letter is nontestimonial and therefore its admission presents no confrontation issue under *Crawford v. Washington* (2004) 541 U.S. 36. The *Aranda-Bruton* rule must be applied in conjunction with *Crawford*. (*People v. Arceo* (2011) 195 Cal.App.4th 556, 571.) Under *Crawford*, the David N. letter is an out-of-court nontestimonial statement which does not warrant confrontation clause protection. (See *People v. Hajak and Vo* (2014) 58 Cal.4th 1144, 1214 [*Aranda-Bruton* rule did not apply to letters because "[p]rivate communications between inmates are not testimonial, and their admission would not violate the principle laid down in *Crawford* that bars the use at trial of testimonial out-of-court statements as to which no opportunity for cross-examination was afforded"].)

Our rejection of this confrontation clause argument does not mean we disagree with Flores's contention the trial court abused its discretion in denying Flores's request for a separate trial from Napoles. For the reasons explained below, we conclude admission of the David N. letter for the truth of the matter asserted against Napoles was so prejudicial to Flores that the court committed reversible error in declining to order separate trials.

While the legislature has stated a preference for joint trials for defendants jointly charged with an offense (§ 1098), a trial court has discretion to order separate trials "'if, among other reasons, there is an incriminating confession by one defendant that implicates a codefendant, or if the defendants will present conflicting defenses.

18

[Citations.]  Additionally, severance may be called for when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  [Citations.]  [¶]  We review a trial court's denial of a severance motion for abuse of discretion based on the facts as they appeared when the court ruled on the motion.  [Citation.]  If we conclude the trial court abused its discretion, reversal is required only if it is reasonably probable that the defendant would have obtained a more favorable result at a separate trial.  [Citations.]  If the court's joinder ruling was proper when it was made, however, we may reverse a judgment only on a showing that joinder "'resulted in "gross unfairness" amounting to a denial of due process.'"  [Citation.]'"  (*People v. Homick* (2012) 55 Cal.4th 816, 848; *People v. Hajek and Vo*, *supra*, 58 Cal.4th at pp. 1172-1173.)

The evidence supporting the assumption Flores was the intended recipient of the David N. letter was tenuous.  It was directed to someone named Juicee-Jay.  There was no evidence Flores had ever used that name as a moniker or nickname.  There was ample evidence demonstrating Flores regularly used his monikers Mickie and Mixter.  Officers and Detectives were aware Flores used these monikers.  Letters found in the same drawer as the David N. letter referenced these monikers and were addressed to Flores at his residence.  No envelope was recovered indicating the David N. letter was mailed to Flores.  The fact it was found in his drawer could mean it was being passed around from gang member to gang member, as Officer Erhardt acknowledged during her testimony.  Despite the fact there was virtually no evidence Flores was the intended recipient of the letter, the prosecution argued the "'spark'" comment meant Napoles had seen Flores shoot a gun and kill someone on October 25, 2008.

The letter was so highly prejudicial, no limiting instruction could cure its prejudicial effect on the jury.  The trial court instructed jurors they could consider the David N. letter for the truth of the matter asserted against Napoles so long as they believed Napoles authored the letter.  Thus, with respect to Napoles, the jury *could* consider the "'spark'" comment and interpret it to mean Napoles had seen Flores shoot a gun.  The trial court further instructed jurors they *could not* consider the David N. letter

for the truth of the matter asserted against Flores. They could only consider it to show a relationship between Flores and Napoles and as a basis for the gang expert's opinion these crimes were gang-motivated. They could not consider the content of the letter as evidence against Flores. Thus, they had to ignore the "'spark'" comment and the prosecution's interpretation of that comment in considering the evidence against Flores.

There was a large disparity between the evidence against Napoles and the evidence against Flores. Napoles was arrested not long after the shooting with the guns used in the shooting in close proximity to him. Flores was not identified as a suspect until two and one-half months after the shooting when detectives saw him being led through the station in handcuffs after an unrelated arrest and believed he fit the general description of the second shooter. Christina Manon identified Napoles as one of the backseat passengers she drove to and away from the scene of the shooting and who exited her car before shots were fired. Manon consistently denied Flores was the other backseat passenger. So vehement was she in her denial that the prosecution made her plea deal contingent only on her identification of Napoles but not Flores.

To the extent the jury credited the prosecution's interpretation of the "'spark'" comment, and to the extent the jury was permitted to consider this comment as evidence against Flores, this would have been the strongest evidence against Flores. The risk the jury improperly considered the content of the David N. letter as evidence against Flores was impermissibly high given the trial court's limiting instruction asked the jury to perform a very confusing task—consider the content of the letter when weighing the evidence against Napoles but ignore the content of the letter when weighing the evidence against Flores. In determining Napoles's guilt, the jury was permitted to consider the evidence that the "'spark'" comment meant Napoles had seen Flores shoot a gun and kill someone on October 25, 2008. But the jury was supposed to ignore this same evidence in determining Flores's guilt.

For the reasons discussed, the trial court abused its discretion in denying Flores's request for a separate trial.

20

Given the much weaker evidence against Flores, we find it is reasonably probable Flores would have obtained a more favorable result in a separate trial in which the content of the David N. letter was excluded. In addition to the evidentiary issues we just addressed, we note the six-pack photographic lineup from which Lopez and Guzman selected Flores's photograph was suggestive in that Flores was the only individual wearing a gray hooded sweatshirt (or a hooded sweatshirt of any color), which is how witnesses described the second shooter's clothing.

We reverse Flores's convictions for murder and attempted murder and remand the matter for further proceedings. If the prosecution retries Flores, it may introduce evidence that a letter from David N. to Juicee-Jay was found in a drawer in Flores's bedroom, and that the letter contained references to other Culver City Boys gang members known to law enforcement. The content of the letter, however, will not be admissible against Flores.

**D. Napoles's contentions on appeal regarding David N. letter**

Napoles does not challenge the trial court's admission of the David N. letter. Nor does he challenge the court's admission of Officer Gomez's (the prosecution's gang expert) testimony about the letter. Napoles contends the court committed reversible error in admitting testimony from Officers Erhardt and Switzer that they believed Napoles authored the letter, and testimony from Officer Switzer and Detective Lumbreras that the "'spark'" comment meant Napoles had seen the intended recipient of the letter commit a shooting. The testimony of each of these officers is summarized in more detail above.

On Napoles's objections to the above-described testimony, the trial court ruled it was admitting the testimony to explain what the officers/detective did next in their investigation. We agree with Napoles that the testimony was irrelevant for this purpose. The jury did not need to hear this particular testimony to understand the progress of the investigation. We need not address this issue further, however. Assuming the court erred, Napoles could not have been prejudiced by the error.

First, Napoles does not challenge Officer Gomez's testimony. As summarized in more detail above, Gomez testified he believed Napoles authored the letter. Moreover, in

21

response to a hypothetical from the prosecutor, Gomez testified he believed the "'spark'" comment was a reference to a muzzle flash from a gun. Thus, similar testimony was admitted to which Napoles did not object below and does not challenge on appeal.

Second, as addressed above, the evidence presented at trial that Napoles discharged a gun at Guillermo and Edgar Lopez was strong. Manon identified Napoles as one of the backseat passengers she drove to and away from the crime scene and who exited her car before shots were fired. Diaz identified Napoles outside her house as the man she saw run toward her with a gun not long after the shooting. She also told officers she saw Napoles run to the area where two guns were recovered from the curb. Ballistics evidence established these guns were used in the shooting. Given the strength of the evidence, we cannot find it is reasonably probable Napoles would have obtained a more favorable result if the testimony he challenges were excluded.

## II.    Jury Issues

### A.  Inquiry into juror fears after note from alternate juror

Napoles contends the trial court committed reversible error in failing to conduct an adequate inquiry after receiving a note from an alternate juror stating, "Judge, [¶] Juror # 10 has expressed to me that she [will] neither vote for or against the defendants in this case, due to the fear generated by the parking situation. [¶] alt # 1." The court received this note on June 26, 2012, the first day of the jury's deliberations.

At the outset of the hearing on this issue on June 26, 2012, the trial court stated it had not received any communication from Juror No. 10. Therefore, the court decided to question Alternate Juror No. 1, but not Juror No. 10. Counsel for all parties agreed with this procedure.

The trial court questioned Alternate Juror No. 1 the same day. Alternate Juror No. 1 explained, on the preceding court day, Friday June 22, 2012, Juror No. 10 told him she was afraid about possible retaliation from people who had seen her car and license plate. She also told him if she were "made to stay on the jury, she would not vote for or against." According to Alternate Juror No. 1, Juror No. 10 was holding a note she had

22

written to the judge. As set forth above, the court did not receive a note from Juror No. 10.

The trial court indicated it was aware of a "situation where individuals that apparently are interested in this case have been to some extent parking" in the same parking structure as jurors. Alternate Juror No. 1 informed the court "the problem" with the parking situation had been "taken care of," and the other individuals were no longer parking near the jurors, and this information had been communicated to Juror No. 10.

The trial court reminded Alternate Juror No. 1 that he was to have no contact with the deliberating jurors, as previously stated in the jury instructions the court had read. Alternate Juror No. 1 indicated he understood and agreed not to tell anyone about the court's inquiry, including the other alternate juror.

After the trial court completed its inquiry, counsel requested the court ask Alternate Juror No. 1 additional questions.[14] In response to the court's question about how the situation arose, Alternate Juror No. 1 stated: "What had happened was for quite a few days several of the women jurors, you know, had spoken openly stating that they were afraid, and had concerns about the parking situation there because they were to understand that it was for jurors and employees only. And so it was taken to the clerk, and she asked her supervisor to address the situation, and it continued on. [¶] So then, at that point, the security people were asked downstairs, and they directed us to the sheriff's department, at which time the sheriff's department took over and resolved the situation." Alternate Juror No. 1 clarified that he is the person who reported the issue to security and the sheriff's department.

Alternate Juror No. 1 also explained to the trial court that Juror No. 7 was present during his conversation with Juror No. 10 on June 22, 2012. Juror No. 7 is the person who alerted Alternate Juror No. 1 to the fact Juror No. 10 was afraid. After his conversation with Juror No. 7, Alternate Juror No. 1 spoke with Juror No. 10 and "let her

---

[14] The sidebar conference was not reported so it is not clear from the record which counsel proposed the further questioning.

23

know that things were being resolved." Juror No. 7 stayed with Alternate Juror No. 1 as they tried to "calm [Juror No. 10] down."

Defendants' counsel asked the trial court to excuse Alternate Juror No. 1 for cause due to the manner in which he had involved himself in this issue. The court denied the motion without prejudice.

The prosecutor asked the trial court to question Juror No. 10. The court declined because it had received no communication from Juror No. 10 or any deliberating juror. Defendants' counsel agreed with the court's ruling and stated they did not want the court to question Juror No. 10.

At the prosecutor's request the trial court asked Alternate Juror No. 1 some follow up questions. Alternate Juror No. 1 informed the court he spoke with two sheriff's deputies and a sergeant about the parking situation. The sergeant stated he would take care of the problem immediately.

The following day, on June 27, 2012, the jury rendered its verdicts. Juror No. 10 participated in the verdicts.

Under section 1089, a trial court may discharge a juror for good cause if the court determines the juror is unable to perform her duty. A juror who refuses to deliberate is unable to perform her duty. (*People v. Cleveland* (2001) 25 Cal.4th 466, 474-475.) "Once a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty 'to make whatever inquiry is reasonably necessary' to determine whether the juror should be discharged." (*People v. Espinoza* (1992) 3 Cal.4th 806, 821; *People v. Cunningham* (2001) 25 Cal.4th 926, 1029.) "[T]o ensure the sanctity and secrecy of the deliberative process, a trial court's inquiry into grounds for discharging a deliberating juror should be as limited as possible, and should cease once the court is satisfied that the juror in question 'is participating in deliberations . . . .'" (*People v. Manibusan* (2013) 58 Cal.4th 40, 53.) "[T]he decision whether (and how) to investigate rests within the sound discretion of the court." (*People v. Engelman* (2002) 28 Cal.4th 436, 442.)

We review the trial court's decision for abuse of discretion. To reverse the court's ruling in this case, the "'juror's inability to perform as a juror "'must appear in the record

24

as a demonstrable reality.'" [Citation.]'" (*People v. Cleveland*, *supra*, 25 Cal.4th at p. 474.)

The trial court did not abuse its discretion in deciding no further investigation was warranted. The court received no communication from Juror No. 10 or a deliberating juror indicating Juror No. 10 was refusing to deliberate. Juror No. 10's conversation with Alternate Juror No. 1 occurred on the preceding court day before deliberations began. During that conversation, Alternate Juror No. 1 assured Juror No. 10 the parking situation had been resolved. According to Alternate Juror No. 1, Juror No. 10 had contemplated sending the judge a note indicating she would not participate in the verdicts. Juror No. 10 decided not to send the note. She did participate in the verdicts and stated in open court she had participated when the jury was polled as to Flores. Based on the record before us, we have no cause to disturb the verdicts against Napoles.

**B. Petition for disclosure of juror contact information**

At a hearing on August 15, 2012, Napoles's counsel stated the defense was concerned "the jury, or members of the jury, were motivated or impeded by fear of gangs, and gang violence and things of that nature." Napoles's counsel informed the trial court the prosecutor disclosed he had been contacted by the jury foreperson, "shortly after the trial was over and the verdict was rendered," and this juror "was calling to express some sort of anxiety . . . for his safety relative to potential gang threat, or lack of safety." The prosecutor explained to the court he was unable to record the call, he "was very reluctant to question the juror," and he did not have time to talk, so he "tried to limit the phone call." The prosecutor recalled the foreperson expressed "a generalized sense of anxiety," but the prosecutor did not believe "his anxiety was about fear, or retaliation, or anything like that." The prosecutor did not recall the specific nature of the juror's anxiety and did not take notes on the conversation because "the call came in unexpectedly." The court and the parties did not explore the issue further at that hearing.

At the next hearing on September 14, 2012, Napoles's counsel asked the trial court to order the prosecution to provide contact information for the jury foreperson who had called the prosecutor. The prosecutor stated he was unsure if the juror's contact

25

information was in his phone logs.  The trial court informed Napoles he needed to file a motion if he wanted to obtain juror contact information.  The court ordered the prosecutor to prepare and provide the defense with a declaration describing the call with the foreperson.

On September 21, 2012, the prosecutor served the defense with the declaration.  The prosecutor stated in the declaration he could not recall the date of the call or the caller's name or phone number.  The prosecutor did not write notes about the call in his phone logs.  The call lasted less than five minutes and the caller identified himself as the jury foreperson.  The prosecutor did not recall the foreperson "mention[ing] the evidence, deliberations, or any juror conduct."  The foreperson told the prosecutor he "did a good job presenting the case," and the prosecutor "thanked him for his service."  The declaration does not state the foreperson expressed anxiety or fear about the case.

On November 26, 2012, Napoles filed a petition for disclosure of contact information for all jurors who served on the case.  Napoles argued there was good cause for such disclosure based on (1) Alternate Juror No. 1's report to the court about Juror No. 10's fears regarding the parking situation, and (2) the foreperson's expression of anxiety during a call to the prosecutor.  Napoles asserted further investigation into these issues was necessary to determine if there was juror misconduct requiring a new trial.  The prosecution filed an opposition to the petition, arguing "there is insufficient evidence of juror misconduct and no good cause to investigate further any allegation of juror misconduct."

On November 29, 2012, the trial court heard oral argument on Napoles's petition.  The court asked the parties whether they had any witnesses under subpoena who would have been permitted to park in the same parking structure as jurors.  Based on the parties' responses, the only persons who might have fallen into that category were victim Edgar Lopez and his family members.  The prosecutor denied telling an attorney for Napoles that he was aware the victims' family members were permitted to park in the same

26

parking structure as jurors during trial, as Napoles's counsel stated in a declaration in support of the petition.[15]

The trial court denied Napoles's petition, stating, "I don't believe that there's a sufficient showing to trigger the next step, which is for the court to then contact each juror individually, and then allow them personally, or through their counsel, to indicate whether or not they choose to be interviewed.  There's no reason now to do that."

A defendant who petitions the trial court for access to personal identifying information of jurors must submit a declaration containing facts establishing good cause for release of such information.  (Code Civ. Proc., §§ 206, subd. (g) & 237, subd. (b).)  To prevail on the petition, the defendant must make "a sufficient showing to support a reasonable belief that jury misconduct occurred, that diligent efforts were made to contact the jurors through other means, and that further investigation is necessary to provide the court with adequate information to rule on a motion for new trial."  (*People v. Jones* (17 Cal.4th 279, 317.)  We review the trial court's decision on the petition for abuse of discretion.  (*Id*. at p. 317.)

Based on the record before us, we find the trial court had no reason to believe jury misconduct occurred.  No juror reported a refusal to deliberate.  The record indicates all jurors participated in the verdicts.  While jurors may have expressed fear and anxiety arising from seeing unidentified persons in the parking structure, there is no indication this fear or anxiety caused a juror to commit misconduct by refusing to deliberate.  The trial court did not abuse its discretion in denying Napoles's petition for access to juror identifying information.

---

[15] In a motion to continue sentencing filed December 10, 2012, Napoles's counsel informed the trial court he spoke with a sergeant from the sheriff's department on November 29, 2012, after the court denied Napoles's petition for disclosure of juror information.  According to Napoles's counsel, the sergeant recalled instructing the prosecutor, on or about June 22, 2012, not to allow the victims' family members to park in the same structure as jurors anymore due to jurors' discomfort with the situation.  The court denied Napoles's request to continue the sentencing so his counsel could explore this issue further.

**III.    Assessments**

As the Attorney General points out, Napoles's abstract of judgment includes only one criminal conviction assessment instead of four. Government Code section 70373 requires the trial court to impose a $30 assessment for each conviction. Napoles was convicted of four offenses. Thus, the trial court must correct the abstract of judgment to reflect the imposition of three additional $30 assessments.

We need not address the Attorney General's claims regarding correction of the fees and assessments on Flores's abstract of judgment because we are reversing Flores's convictions.

## DISPOSITION

The judgment against Miguel Flores is reversed and the matter is remanded for further proceedings consistent with this opinion. As to David Napoles, the judgment is modified to reflect four $30 criminal conviction assessments under Government Code section 70373, for a total of $120. As so modified, the judgment against Napoles is affirmed. The clerk of the superior court is directed to prepare an amended abstract of judgment for Napoles and to forward it to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED.


CHANEY, J.


We concur:



ROTHSCHILD, P. J.



JOHNSON, J.

28